UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSA THOMAS,

        Plaintiff,

v.

        Case Number 17-10456
        Honorable David M. Lawson

MACOMB COUNTY, a/k/a MACOMB
COUNTY COMMUNITY MENTAL HEALTH
DIVISION and JOHN KINCH,

        Defendants.

_____/

## **OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rosa Thomas filed a complaint alleging that she was constructively discharged by the defendants from her job as a Clinical Strategist and Improvement Director at Macomb County, Michigan's Community Mental Health Division. That followed a disciplinary proceeding when she was accused of granting access to medical records in violation of the Health Insurance Portability and Accountability Act (HIPAA) and given a two-day suspension, which was later reversed. She contends that her discharge amounted to national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 (she was born in Peru), and violated her right to procedural due process. After a full opportunity for discovery, the defendants have moved for summary judgment. The undisputed facts show that Ms. Thomas was not constructively discharged; she quit. There is no evidence that any of the defendants' actions were motivated by her Peruvian ancestry. And she was afforded due process during disciplinary proceedings. The Court will grant the defendants' motion and dismiss the case.

I.

The basic facts of the case are undisputed. Plaintiff Rosa Thomas was born in Peru and moved to the United States after receiving the Peruvian equivalent of a Master's Degree in Psychology. She was issued a limited license to practice by the American Board of Psychology. In August 2016, she was hired by defendant Macomb County Community Mental Health Division (MCCMHD), where she was employed as a Director of Clinical Strategies and Improvements.

One of Thomas's duties was to handle requests by various outside entities for access to the County's database of protected health information, which is maintained in a computer system known as "FOCUS." In order to receive access, such entities were required to execute a "Business Associate Agreement" and a "Qualified Service Agreement" with the County, which governed their use of any information to which they were allowed access. Among other things, those agreements required the entities to ensure that they requested and used only the "minimum necessary" access to the FOCUS system needed to perform their appointed tasks. Thomas testified that it was her understanding, and the practice and policy of the County, that as long as those agreements were in place, the entities would be allowed access to those portions of the system that they needed in order to complete whatever tasks the County had retained them to perform.

The FOCUS system regulates access by users based on which "service area" is assigned to that user; those service areas are designated with labels such as "clinical," "claims," and "audit." An entity's access to the "clinical" and "claims" service areas can be restricted on a record-by-record basis. However, the system apparently is not capable of imposing discrete record restrictions for the "audit" service area. A user granted access to that service area is allowed to access all files

stored in the system without restriction, regardless of how many files they actually need to review to perform their task.

On April 12, 2016, a representative of Molina Healthcare contacted the County and requested access to seven specified files in the FOCUS system, for the purpose of performing an audit. The request was routed to the plaintiff, and, after she determined that Molina had executed the required agreements, she issued a password for the system that allowed Molina's representative to access the "audit" service area. Because of the system characteristics explained above, that setting allowed Molina to view all the electronic records stored in the system.

Some time later, MCCMHD's Corporate Compliance Officer, Kimberly Cope, learned that Molina had been granted access to the "audit" service area in FOCUS, and she undertook an investigation to determine if the access properly was granted. As a result of that investigation, on May 27, 2016, Thomas received a letter notifying her that she would have to appear at a disciplinary hearing to answer a charge that she improperly allowed an external contractor access to all records in the FOCUS database. The letter stated the charge as follows:

> On or around April 12, 2016 and at your direction as Program Director and authority for [the] Clinical Services / Quality Improvement Department, you authorized and arranged for a Molina contract agent to have view access to the entire Macomb County CMH FOCUS electronic medical record.
>
> Your decisions in this regard are deemed to be violations of HIPAA regulations to protect the privacy of individually identifiable health information. Further, your actions are violations [of the] Michigan Mental Health Code [and] 45 C.F.R. 160.203(b) and 42 U.S.C. 1320d-2(c)(2).

Thomas appeared at the hearing, where she was represented by counsel (also her attorney of record in this case). She contends that she was "ambushed" at the hearing when she was required to respond to further charges that her handling of the access control request constituted a violation

of the defendant's policy for handling protected health information; that charge was not mentioned in the notice letter. At the hearing, the hearing officer discussed the information gathered in the investigation, Thomas spoke on her own behalf, and her attorney argued orally against the imposition of discipline. At the end of the hearing, those present were asked if they had "anything else to add," and presumably answered in the negative. After the hearing, Thomas received a letter notifying her of the decision, which stated:

> Upon completion of the investigation, the conclusion is that you did authorize for a Molina contract agent to have access to the Macomb County CMH FOCUS electronic medical record, and said access to the records was in violation of standards for release of Protected Health Information. For this reason, you are being issued a two (2) day non-paid disciplinary suspension for June 09, 2016 and June 10, 2016 with a return to work dated of June 13, 2016.
>
> If you are involved in similar misconduct in the future, you will be subject to progressive discipline up to and including discharge.

On June 8, 2016, Thomas asked to meet with Karen Bathanti, the defendant's Director of Human Resources and Labor Relations, to discuss the hearing process. Thomas informed Bathanti at that time that she was looking for a new job.

On June 14, 2016, Thomas submitted a seven-page appeal letter challenging the disciplinary decision, in which she asserted that she was not afforded sufficient due process, she should not have been subjected to any discipline because it was determined at the hearing that no HIPAA violation occurred, and she was treated differently for handling the access control request the same way than other (non-minority) employees had handled such requests, citing one example. On November 2, 2016, Eric Herppich, the County's Director of Human Resources and Labor Relations (the record indicates that Bathanti and Herppich both held this title; it is unclear whether Herppich was a peer or successor to Bathanti, or whether the County denotes all HR officers as "directors."), sent a letter

to Thomas stating that he had "reviewed your June 15, 2016 appeal of the circumstances that caused you to receive a two (2) day disciplinary suspension and concluded that the discipline will be removed from your file."

Herppich did not elaborate in his letter on the basis for the reversal, but at his deposition he testified that he decided to rescind the discipline based on his finding that the sanction for violating a supposed access control policy was unfair, where there was no formal policy on point:

> A. I recall when I read the discipline letter for Ms. Thomas that the reason she was disciplined was not because of a HIPAA violation, it was discipline as it relates to a policy violation, if I recall. So I was focused on what was the policy violation. I really didn't spend any time dealing with the HIPAA, because that wasn't the reason why she was disciplined.
> Q. All right, fair enough. So what was the policy that you were looking at?
> A. I'm not really sure I ever got a policy that articulated the reason why Ms. Thomas was disciplined, at least to my satisfaction.
> . . .
> A. My . . . view of the issue was that [there wasn't] any clear process [or] policy expectation as to how granting permission was supposed to occur. . . . So I really, at the end of the day, felt that lacking that clear direction, that discipline for Ms. Thomas wasn't fair.

Thomas testified at her deposition that she was distraught after she received the June 7, 2016 disciplinary letter. However, she conceded that her job duties, position, and compensation were not altered as a result of the disciplinary proceeding, beyond the sanction of two-days pay (which appears to have been restored in full after Thomas prevailed on her appeal). When asked to describe "what became intolerable" about her working conditions after she was disciplined, Thomas testified as follows:

> Everyone was treating me differently.
> . . .
> I couldn't go to meetings without people looking at [me], making comments. I'm not saying it was just one person. I couldn't go to the meetings anymore. I was coming to work and sitting and crying my eyes out before I went into my office because my employees would say, are you okay? And it was like I had — I couldn't face

anybody. I couldn't look at the face of anybody. And, you know, I had pride [in] myself. I work. I went to school. I came to this country. I decide[d] to work using my English skills rather than segregating myself with Hispanic speaking people. And all of that was good. And I had to go every single day and have to have my employees in my office come and give me a hug and said, it's going to be okay, Rosa. I'm supposed to do that for them. I'm suppose[d] to mentor them. I'm not supposed to [be] breaking down. And I had to eat every one of my tears and go downstairs and [sit] in my car by myself and said, it's going to be okay. And then the day I got a new job, I had to tell them what happened. I had to.
. . .
It was just not — when you see people texting each other and my assistant came and said, I think they are texting each other about what happened.

On August 4, 2016, while her appeal of the disciplinary decision still was pending, Thomas voluntarily resigned from her job.

Thomas made a charge of discrimination with the Equal Employment Opportunity Commission. After she received her right-to-sue letter, she filed her complaint in this case, alleging race or national origin discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (Count I), procedural due process violations via 42 U.S.C. § 1983 (Count II), and intentional infliction of emotional distress (Count III). The parties have agreed to dismiss Count III. The plaintiff opposes dismissal of Counts I and II.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, the party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the party opposing the motion contends facts are in dispute, she may not "rely on the hope that the trier of fact will disbelieve the movant's denial

of a disputed fact" but must make an affirmative showing with proper evidence to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Nor may she "simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).

Instead, the opposing party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Those facts must be "established by evidence that will be admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing Fed. R. Civ. P. 56(e)(2)) If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

A.

The Title VII discrimination claim requires that the plaintiff establish an adverse employment action. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). The procedural due process claim likewise mandates proof of a life, liberty, or property interest deprivation. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). Thomas contends she can satisfy both elements by showing that she lost her job through constructive discharge. The evidence does not sustain that position.

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that [her] 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, --- U.S. ---, 136 S. Ct. 1769, 1776 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* at 1776-77 (citing *Suders*, 542 U.S. at 142-143). "A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign," and "[s]he must also show that [s]he actually resigned." *Id.* at 1777. "To demonstrate a constructive discharge, [the plaintiff] must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727-28 (6th Cir. 2014).

The Sixth Circuit has adopted the factors articulated by the Fifth Circuit for determining when an employer can be said to have intentionally created intolerable working conditions. *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001). The court explained:

> Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)); *see also Laster*, 746 F.3d at 728.

Thomas has failed to point to any circumstances she had to endure that could sustain her claim that she was subjected to an objectively intolerable work environment that left her with no option but to resign. She has not offered any evidence that she suffered any tangible change in her circumstances such as a demotion, reduction in pay or responsibility, reassignment to different duties or a different supervisor, or that the defendant confronted her with any terms for her to retire or be hired into a less attractive position. Thomas does insist that she was subjected to "badgering," or "harassment" by co-workers, but none of that conduct has or can be attributed to her employer. Moreover, most of her testimony on point in fact attested to behavior that was supportive, conciliatory, and sympathetic toward her. And the plaintiff did not identify any actual specific comments made by anyone that were in any way critical or degrading. Instead, her testimony only vaguely alludes to co-workers "texting" or "making comments," which she did not describe, and that she supposed were related to her discipline.

The plaintiff's testimony suggests, at most, that she was upset about the fact that she was disciplined and her sensibilities were deeply offended. But she has failed to identify any pervasive conduct by any of her supervisors or co-workers that could be construed as harassment meant to force her to resign. She is not close to proving that her employer deliberately created the conditions she described, or that her employer wanted to force her to quit.

Even if the co-worker chatter rose to the level of badgering or even harassment — which it did not — the Sixth Circuit has held that, where that is the only allegedly intolerable circumstance, the relevant conduct must be so pervasive and persistent that it continues unabated for a significant

time. *See e.g., Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (upholding district court's determination that the harassment which included 15 specific incidents over a two-year period "did not rise to the level of severity or pervasiveness that would unreasonably interfere with her ability to work."); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir. 2000) (six-month period involving three sexually offensive remarks by supervisor, including a battery, did not constitute pervasive conduct); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (teasing, comments, and isolated incidents, including an unwanted sexual advance, did not alter terms and conditions of employment); *Dotson v. Norfolk Southern R.R. Co.*, 52 F. App'x. 655, 659 (6th Cir. 2002) (conduct including coworker's persistent use of "KKK" instead of his own initials on work documents, coworker's use of term "Ungawa" from Tarzan movies as salutation, coworkers' use of names such as "tar baby" and harsh treatment of plaintiff, managerial use of janitorial service that employed worker who harassed plaintiff, and allegations of disparate discipline and promotional practices — all still insufficient to satisfy severity component of claim); *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (three of five incidents which "contained an element of physical invasion" were insufficiently severe or pervasive).

Here, the plaintiff does not dispute that she told the defendant's HR officer that she was seeking a new job the day after she received the disciplinary letter, and that she voluntarily resigned less than two months later, on August 4, 2016. The plaintiff has not identified when any of the supposed co-worker "texting" and "comments" occurred, and her testimony certainly does not suffice to show that any such conduct occurred for a significant time; by her own account, it only commenced after her disciplinary hearing, and it persisted for an unspecified period lasting at most no more than two months. On far more compelling facts the Sixth Circuit readily has found no

-10-

evidence of badgering or harassment sufficient to be construed as objectively intolerable. *See Brister v. Michigan Bell Telephone Co.*, 705 F. App'x 356, 360 (6th Cir. 2017) (finding insufficient evidence of constructive discharge where the record included "(1) testimony from a fellow manager that he found Jeup crying from Keeling's unfair treatment; (2) testimony from a fellow manager that he observed Keeling harassing and treating Jeup abusively; (3) the fact that within a month of becoming Jeup's supervisor, Keeling began targeting her for humiliation and criticism at meetings; (4) comments from Keeling to Jeup degrading her and calling her stupid during their daily coaching sessions; (5) comments from Keeling to Jeup telling her that everyone in the office hated her and did not want her there; (6) comments from Keeling telling Jeup that she needed to seek psychological help and seek help from the employee assistance program; and (7) comments from Keeling to Jeup, stating 'it's them or you' and that she needed to 'learn to play the game'"). Similarly, where, as here, the plaintiff presented evidence of, at most, only fleeting and isolated unfavorable comments, the court of appeals has found that the record was insufficient to sustain any claim of constructive discharge. *See Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708-09 (6th Cir. 2004) (observing that if the supervisor had "persisted in making these remarks over the course of [the plaintiff's] employment, a jury could infer that [the supervisor] was doing everything in his power to fire her. But the fleeting nature of these comments and [the plaintiff's] hasty response preclude our conclusion that they constituted a constructive discharge").

The undisputed evidence does not support an inference that Thomas was constructively discharged from her county job. Therefore, she has not established an essential element of her claims under Title VII or section 1983.

B.

The proofs are wanting on other aspects of the plaintiff's claims as well.

1.

To prove national origin discrimination, the plaintiff must offer evidence to establish a genuine fact question on these elements: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier*, 388 F.3d at 987. Thomas has not shown an alternate form of adverse action.

"An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (internal quotation marks omitted). "A 'mere inconvenience or an alteration of job responsibilities' . . . is not enough to constitute an adverse employment action." *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (quoting *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

Thomas certainly was upset over the investigation into a possible HIPAA violation, which called into question her competence, and even perhaps, her integrity. But it is well established that the investigation itself cannot suffice to show that the plaintiff suffered any "adverse action" sufficient to sustain her discrimination claim. "[E]mployer investigations into suspected wrongdoing, standing alone, are not generally considered actionable adverse employment actions,"

particularly where the "proposed discipline was not implemented." *Agrawal v. Montemagno*, 574 F. App'x 570, 576 (6th Cir. 2014). The initial disciplinary finding also was not an adverse action, because it later was reversed on appeal (after the plaintiff voluntarily resigned, but well before this litigation was commenced). *See Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) ("The negative recommendations of the EAS Department and Dean Davison regarding Kathleen's application for a promotional pay supplement are not adverse actions because Kathleen resigned before CMU made a final decision to deny her request for a salary increase.").

2.

Nor has she established a deprivation of a property right without due process. She has brought that claim via 42 U.S.C. § 1983, which requires that she show "(1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The constitutional right she asserts emanates from the Fourteenth Amendment's Due Process Clause. That Clause "protect[s] both procedural and substantive due process rights." *Puckett v. Lexington-Fayette Urban County Gov't*, 833 F.3d 590, 604 (6th Cir. 2016) (citing *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 572-74 (6th Cir. 2008); *Wojcik v. City of Romulus*, 257 F.3d 600, 610-11 (6th Cir. 2001)). But to establish a procedural due process violation, the plaintiff must show that she (1) had a life, liberty, or property interest protected by the Constitution; (2) was deprived of that interest by a state actor; and (3) was not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009).

Federal courts have recognized that state civil servants may have a property interest in continued employment under certain circumstances and must be afforded due process before being discharged. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985); *Relford v. Lexington-Fayette Urban County Gov't*, 390 F.3d 452, 460 (6th Cir. 2004) ("Under state law, government and civil service employees may have a property right in their continued employment."). Public employees with a property interest in their jobs generally must have a hearing before termination and afterward. *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 766-67 (6th Cir. 2010) ("'For a public employee with a property interest in continued employment, due process includes a pre-termination opportunity to respond, coupled with post-termination administrative procedures.'" (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006)).

The Sixth Circuit has observed that "[p]re-termination hearings 'need not be elaborate.'" *Mitchell*, 375 F.3d at 480 (quoting *Loudermill*, 470 U.S. at 545). Nonetheless, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546; *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (noting that the fundamental requirement of procedural due process is that an individual be given an opportunity to be heard at a meaningful time and in a meaningful manner). Pre-termination hearings have been described as an "initial check against mistaken decisions." *Loudermill*, 470 U.S. at 545.

Thomas's hearing served precisely that purpose. The only procedural defect that she identified in her disciplinary proceeding was the supposed inaccuracy of the charging letter, which stated that she would have to answer for a "HIPAA violation," when she actually was called to account for a "policy violation." But, regardless of any defect in the hearing notice, it is undisputed

that the plaintiff well understood the nature of the charges against her, at least at the hearing, and she was afforded ample opportunity to respond to the actual charge after the hearing, through the course of her appeal (on which she ultimately prevailed). *See Morrison v. Warren*, 375 F.3d 468, 476 (6th Cir. 2004) ("We hold that Morrison had plenty of time during the arbitration . . . to know of and rebut the second charge against him.").

Moreover, Thomas had access to an effective post-hearing procedure: her appeal in which she prevailed. Courts in our circuit have recognized that "post-termination procedures [are] inextricably intertwined with the scope of pre-termination procedures." *Carter v. Western Reserve Psychiatric Habilitation Center*, 767 F.2d 270, 273 (6th Cir. 1985) (per curiam). Here, any unfairness that may have flowed from the notice of charge certainly was remedied by the defendant's post-deprivation procedure. Therefore, in addition to failing to identify any adverse action that actually was imposed as a result of the disciplinary investigation, Thomas also has failed to point to any cognizable procedural defect by which she was deprived of adequate notice and an opportunity make a meaningful and timely presentation of her case.

III.

The parties have agreed that the plaintiff's claim for intentional infliction of emotional distress should be dismissed. The plaintiff has brought claims of improper discipline and wrongful discharge, but she has failed to present any evidence that she ever suffered any actual discipline, or that she was subjected to any objectively intolerable conditions sufficient to sustain her wrongful termination claim under a constructive discharge theory. Nor has she shown that she was deprived of any procedural rights mandated by the Constitution. The undisputed facts demonstrate that the defendants are entitled to a judgment as a matter of law.

The Court finds that the facts and legal arguments are adequately presented by the papers and the decision process would not be significantly aided by oral arguments; therefore, the motion will be resolved on the briefs submitted pursuant to E.D. Mich. L.R. 7.1(e)(2).

Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2).

It is further **ORDERED** that the defendants' motion for summary judgment [dkt. #9] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: January 11, 2018

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 11, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI